And I'm going to ask her as well, but my understanding is, from the papers, is that PRA is not in this deal, is not charging interest on a going forward basis. So if they're not charging interest on a going forward basis, then they're in a different position than Capital One. They're not seeking to be a non-licensee that is essentially stepping in the shoes, other than this singular debt that they've assumed. Sure, so, but the issue... That they've bought, I'm sorry. We don't know what the purchase agreement says. So it could allow them to charge interest. Debt they chose not to chose interest does not bring them outside the scope of the statute. So if the statute doesn't apply, they could still charge interest at 22.9%. Just because they are not actively charging interest does not bring them outside the scope of the statute. Wouldn't the LAPL still be in force? Sorry? Wouldn't the LAPL still be in force? Wouldn't there still be the 6% limit? Well, so if they're exempt, though, from this statute, I don't think that would be the case. Because what this statute does is it limits charging, collecting, contracting for, and receiving interest and fees. So if they are just exempt from the statute, as long as they don't charge interest, that reads out collecting, contracting for, and receiving. That interest obligation. But there's a different statute that imposes the 6% limitation. Sure. Why isn't that still in play? Regardless of whether someone has a license under this particular section. Sure. So I have not considered that, Your Honor. I'm just looking at this statute as it's read. The plain language of it, it clearly prohibits collecting interest, which only is an activity that occurs when a loan is defaulted. Can I just take you back to the language we're talking about, the statutory plain language, back to 6213? Yes. Because a corporation licensed under this Act has certain powers, and it lists those powers as to lend money on certain terms, to lend money without security, to lend money on promissory note, and then a separate category of purchasing contracts, evidencing an agreement to pay a sum certain. Doesn't that tell us that there is a distinction between a loan and the contract to collect on a sum certain, whether that was originally in the form of a loan or not? So I understand, so the question is, and I'm just trying to understand, I apologize, is that the way contract at least is treated in Section 6213 or the other sections would suggest that the term contract is broader and includes performing and non-performing obligations, where the term loan just includes the performing obligation, is that? It is distinct from a loan as that term is used within the statute. Sure. So the term loan, though, is, I mean, I know I keep coming back to this, but the plain meaning of the term means a sum of money to be repaid. With interest, usually. Usually with interest, right? It doesn't have to be with interest. I mean, it could be with interest, it could be not. No interest loan, yeah. But still, Capital One, I mean, PRA still negotiates with Capital One either to be able to charge that interest or to collect that interest. But what PRA negotiates with, no one says that PRA loans money to Capital One or vice versa. There's nothing about that negotiation that's a loan. The position, hey, Capital One's loaning us money or we're loaning money to Capital One. That interface, there's no loan there, right? Of course. And so it's weird to say that they're in the business of negotiating a loan when the only party that they negotiated with, they weren't loaning money to anyone in that relationship. I understand your point, Your Honor, but I think that's not in the text of the statute. What the text of the statute says is in the business of negotiating or making loans, not in the business of loaning money to or loaning money from. But, look, I don't understand your response to the judge's question, right? Usually when someone makes a textualist argument, it's this text will take care of the argument. But your reference back or referral back doesn't answer his question, right? So the language, the negotiating loan, negotiating or making loans or advances of money on credit doesn't apply to the relationship between PRA and Capital One. That's not what the statute covers. It covers the underlying loan. And as between PRA and Lutz, there is no such relationship. So if you want to take a textualist approach, which is what we're asking you about, shouldn't we just say it doesn't apply to the transaction that PRA has assumed? I am reading the text differently in that it's either making or buying loans. That's what the text said. It doesn't say buying. You just added a word to the text. Negotiating is transferring an obligation. Wow. No, no, no. You can't be a textualist and do that now. Come on now. Even someone with my background knows you can't do that. Just one second. I'm sorry. Help me now. How are we going to make that jump? You're injecting words with different meanings into what we're reading to you. So negotiating is not a defined term in the statute. So we have to look to what the meaning of the word was. And that's what I'm going off of, if you'll bear with me. PRA is not negotiating with Lutz. And the transaction between PRA and Capital One is not one that the – it does not represent a negotiation. I mean, it's a purchase and sale, essentially, or a purchase. It's a debt certain that PRA is acquiring. None of the language seems to work together. To the extent it's a negotiation, doesn't the language of the statute tell us that's a negotiation over a contract, evidencing an agreement to pay a sum certain, not a negotiation over a loan? I guess I'm just not understanding the distinction between the term contract and loan, because they both refer, again, to a sum of money to be repaid. So why does the statute make a distinction? Between contract and loan? Yes. So I just – from – I'm not sure that that – because – bear with me. So, I mean, with regard to lease contract, the term contract, the statute obviously covers default as well as performing contracts. We know that from Section 6213.p, which governs the collection of attorney's fees and costs on contracts of default. Again, we know that from the transfer provisions of the statute, Section 6203, Section 6214.i, 10 PA Code 41.6a. They all prohibit transfers of licenses of loans or the right to charge and collect interest on contracts. So, clearly, the statute itself covers both performing and non-performing contracts by its text. I don't see why there would be any basis to distinguish the term loan from contract when the plain meaning of that term governs both performing and non-performing obligations. So that's why we believe that they refer to similar things. If we were to hold that the CDCA applies to PRE even though it holds to CCC licenses, wouldn't that be reading out of the CDCA the provision shall not apply to any person licensed by the Secretary of Banking? So I think the most important thing to look at at Section 6217 is the first sentence. So in that sentence, it says that this act shall not affect any existing law, special or general, authorizing a charge for the loan of money in excess of interest at the legal rate. So that first sentence cabins the scope of Section 6217 to ensure that the CDCA does not affect other laws governing the charging or collecting of interest. So to further that purpose, the second sentence of the statute, the sentence you just read, said that the act shall not apply to any person that is licensed by the Secretary of Banking under any other statute. So the purpose of Section 6217, again, is to ensure that the statute does not interfere with other interest rate regulations. So here, application of the statute to PRE would not render Section 6217 superfluous because PRE was not acting within the authority of its CCC license. And is that because of the 21.9% versus 21%? Yes, so there was the 21% interest cap was the interest that they could charge under the CCC license, and then they tried to collect the 22.9% interest. So if they charged 21%, they'd be within their rights based on their CCC license, and you'd have no claim? I think that's one way to read the statute, but the way that we read it was because the CCC regulates indirect dealer-made car loans. So because of that, this loan was not that, so they could only charge 6% interest without a CDCA license on this loan. But, you know, I mean, licenses do double duty. I mean, the amount of things that you can do with a driver's license, a lot of states let you register to vote. It can get you a number of things because they trust the licensing process. They trust that the Department of Motor Vehicles will require valid proof of identity and everything. So it makes sense to let one state agency handle the licenses because there's just a certain degree of trust associated with that. It may be that driver's licenses are used for a whole proxy of things that have nothing to do with cars on the road, but it's just a trust. And so why is it that when we say if you're licensed, when the statute says if you're licensed by the Secretary of Banking, even if it is for something unrelated, why don't we just read that statute to say, okay, that's just associated with the trust that we give that entity, and the consequences that come with being regulated by that license. And so, but after that, we don't demand that everything about that license be used for the purpose for which that license was done, much like we don't do that with driver's licenses. And so it seems that what you're reading in is the notion that that very purpose that you're licensed for has to be the purpose that the statute is used for here, but the statute doesn't contain that kind of extra requirement, just as if you're licensed. That's text, right? But if, so the point, with that argument, though, the trust that comes with being licensed under another statute, if PRA is exempt from the CDCA, then the CDCA cannot be applied to them. If they exceed the bounds of their other statute and direct their conduct to the CDCA. So that exemption would prohibit the department or anyone else from applying the statute to them. So that's why, in addition to the first sentence and the way it reads the scope of section 617 of B, that we do not believe that the exemption is that broad, because it would prohibit the department from, or anyone else, from enforcing the CDCA against PRA in the event that it was not applied to them. It would prohibit the department from enforcing a statute that exceeds the scope of its other licenses and engages in conduct within the scope of the CDCA. So that means you, in every instance of a licensee from another, pursuant to another statute, you'd have to be doing this balancing, like CDCA is 22.9, this other statute is 15.  So you're saying that we should read that into the statute? I think that's what the statute says, that it shall not affect any existing law, special or general, authorizing a charge for the loan of money in excess of interest at the legal rate. So I don't think it's a, it's not a balancing test, it's just what are the rights that are granted by this statute. Has that entity exceeded those rights and is it directing its conduct to the CDCA? You would essentially have us adopt the position of the Secretary of Banking. What was that? You would have us adopt the position of the Secretary of Banking in connection with the interpretation of this phrase. On this phrase, yes. I think that interpretation is consistent with the plain meaning and purpose of the Texas statute. Thanks very much. Thank you. Good morning, Your Honors. Tammy Adkins on behalf of Portfolio Recovery Associates, or PRA for short. I'm sure you're very excited to start, but I'd love to start where you, in one of the places your adversary left off, I'm just trying to get a basic understanding of what this transaction is and what it means. So the hypothetical I gave to your adversary at the beginning, I wonder if you could talk to that. Which is, if we assume $100,000 debt, I know the numbers are smaller by statute and so forth, just for ease of reference. If we assume $100,000 debt, is the basics of the loan between Capital One and Lutz, okay? For the course of a year, interest rates 22.9%, so between January 1 and December 31, $22,900 has accrued. There's a debt on December 31 of $122,900. Right at that time, PRA engages in a transaction with Capital One, purchases that loan, okay? So on January 1 of the new year, Lutz owes PRA $122,900. Well, my first question is, does Lutz owe PRA $122,900 in my hypothetical? Yes, that is correct. Okay, great. On a going forward basis, from January 1 forward, is PRA $122,900? Forget about whether they will, are they capable of charging interest on that $122,900? Yes, so it is hypothetical at that point, because that's not what PRA would do. But if you follow the OCC regulation, the contract is valid when made, which says that Capital One is entitled to charge 22.9% interest. And those terms would continue even if Capital One sells it to someone else, because it's the terms of the contract and the agreement between Lutz. In this particular circumstance, if I read your papers correctly, my understanding is on a going forward basis, from January 1 forward, PRA would not be charging Lutz interest. Is that correct? That is correct, because it's purchasing a charged-off debt. At that point, it's no longer a loan anyway, because I know we're going outside of your hypothetical. But at this point, in order for the bank to have charged it off under the National Bank Act and the regulations of the OCC, six months have gone by with no payments. And it's at that point that under a credit card agreement, the bank can... It's been six months before, and there hasn't been any ability to continue charging on it. But at that point, at the six months, 180-day mark, or sometime within that month, the bank has to accelerate the loan and charge it off. And it's at that point that it would be sold to PRA. So at that point, it's a breached contract. Answering Mr. Abramowitz's point, why should we read a charged-off loan or a non-performing loan to be something other than a loan? Well, at that point, again, and this goes to the point that was being discussed with Mr. Abramowitz, that it is a loan when it's made by Capital One. Capital One is the one that negotiates the loan and makes the loan. PRA isn't negotiating a loan or even obtaining a loan at that point. It ceases to be a loan at that point because it's been defaulted, it's in breach, and it's now just an account, an obligation or an account. But it's not a loan in the sense that the 6203 is really talking about. Where can we find in the text of the statute that it takes on some other character than being a loan? I mean, there's nothing in the text of the statute that says that it's no longer a loan at that point. But you have to look at it in the context of the entire statute of 6203, which is talking about the negotiation of a loan, not what PRA is doing at this point where it is obtaining a charged off account that at one time was a loan. So if you look at the kind of the context of 6203, it's clear that what the legislature is trying to do is prevent kind of people doing an end run around the interest rate by including and stacking on fees and, you know, other things that relate to the original interest rate. So it regulates agents and brokers. 6203B of the statute talks about that somebody can't add a referral fee or like a finder's fee. So it's the whole context of 6203 is really talking about the origination of the loan and that's who is negotiating the loan. But it's not limited to origination. It includes the collection and receipt, right? Yeah, it does talk about collection. But if you look at, so, I mean, I interpret that to be referring to someone like a servicer who they're not the actual maker of the loan or the lender, but it's somebody who is servicing the loan and would be collecting the interest as it becomes due when it's a, you know, a performing loan. This is kind of consistent with 6213, all the different provisions within 6213 that talk about collect. It's talking about contemporaneous collecting of interest or fees or charges like, you know, that you can collect attorney's fees that the account is in arrears or you can collect the fee that if you have to, if it converted to a judgment, you know, you can collect the fee that you, that for, you know, to the government agency for registering that. So I think the word collect is talking about the contemporaneous collection of the fee, not collecting fees that were previously charged by the prior owner or lender of the account after it's been charged off. Are we supposed to just divine that from collection in the statute? The statute itself doesn't make a distinction between, you know, when it's currently due versus when it's overdue. No, that's true. The statute does not define the word collection. But again, I think it's, part of it is having to look at the context and all the different uses of the word collect within the statute. How about the word negotiate? Because in your response to the banking department's amicus brief, you say both that the definition could apply to a debt buyer's acquisition of an account. But also that only a transferor can negotiate. I think that's right. When you look at the definitions, both the definition that was from Black's Law Dictionary that the district court used or the definition that the secretary of banking uses, there are two different uses of the word negotiate. And the one that your honors were talking about with Mr. Abramowitz mostly is the negotiation in terms of like the conversation that happens when you're negotiating. The bargaining, correct. And then there is another use of negotiate, and that's when you're negotiating an instrument. And that's more like the UCC version of negotiate where you're endorsing. So that really only, in this instance, would relate to Capital One. If Capital One were to sign over and endorse the instrument to PRA, what you're doing is transferring the right to enforce it from Capital One to... But under that second definition, it refers to the entity doing the transferring, which PRA is a recipient, not the entity doing the transferring. Then also you'd assume that, I mean not to make the entire UCC simple, it's impossible, but you would think that it would relate to something that was otherwise in a negotiable instrument that you would then negotiate through transfer. And this loan is not a negotiable instrument. As far as I know under the UCC, and so therefore the notion that it could be negotiated as that other meaning is, which applies to negotiable instruments, like endorsing a check, you know, to pay your dry cleaning, you know, or, you know, your grandma's check you endorse and you give it to your dry cleaner and say now you can cash this because I endorsed that, that's different, that's just not what's going on here. So it seems that the real, I mean if it is, you may prevail on that ground because PRA didn't do any of that kind of endorsing, but the real issue is the bargaining. And I mean, so if negotiation means bargaining, then we're just really left with kind of the deep tension on 6203, which is your adversary basically says once a loan, always a loan. And you basically say once a loan, not a loan after being charged off. And if we agree that once a loan, always a loan, then it feels like what they did was negotiate a loan. If we agree with you, I think it's more factual than it is statutory at one level, but there is statutory points for some certain and other things like that, that maybe once a loan now charged off, then you would win. Because that's not what was negotiated. So the real answer that you kind of have to, the item that you have to beat to win is this notion of once a loan, always a loan. And so what in the statute kind of lets us know that Pennsylvania is not using a once a loan, always a loan approach? So I think what crystallizes this for me is actually the Department of Banking's letter. Because what the Department of Banking is saying is you have to take it a step back and really look at 6217. When the loan was originated, when it was negotiated originally, that was by Capital One. And Capital One is exempt from the statute. And the Department of Banking basically is saying that makes this not a CDCA loan. And so, and this kind of goes hand in hand with the discussion about 6203, that when it's talking about negotiating a loan, it's talking about the origination of the loan. Making or originating, like negotiating the loan at its inception. So the Department of Banking, in their letter, they're basically saying, we look at this as though if something falls out of the statute, it's a loan. But if it falls under 6217 as an exemption, then it's just outside of the statute. It's outside of the CDCA. And it is for the life of the loan. We owe the Department of Banking deference. I'm sorry. I said, do we owe the Department of Banking deference on this issue? I think that you do. So the Pennsylvania Supreme Court in Department of Banking versus NCAS of Delaware says that the Department of Banking is given great deference with respect to this statute. Which makes sense. They're the regulator who oversees this and issues the license and the licensing and makes the determinations over the last 85 years. And so it puts the Department in a very awkward situation, frankly, if this federal court is going to tell it, no, no, you actually have to issue licenses to these entities, when it thinks it doesn't have authority over those entities and never did. And it also creates a snowball effect or a ripple effect that if the court were to say that PRA is not going to issue licenses to these entities, it's going to have a ripple effect. And so if you're talking about a loan that was covered by the Act with respect to a loan that was originated outside of the CDCA, because it was under Section 17, it rose out under Section 17, you're not just talking about charged off banking, you know, credit card debts, you're talking about anybody who was exempt. So you're talking about, like, dentist and orthodontist and physician loans for the financing of, you know, orthodontia or buildings and loans. You're talking about anybody else who has a license that's been issued by the Secretary of Banking. And then also, as the Secretary of Banking pointed out in their letter, it's now been merged with the Securities Commission. And so it even has now authority over so many other entities and industries that were never contemplated in 1937. Any of the loans that arise under any of those exemptions, if you say here, you know, the PRA has to have a license, you're not just talking about a loan that's been issued by the Secretary of Banking. If you say, you know, you have a license for the Department of, or for the Capital One loan, all of those other things would fall in, too. And suddenly, those charged off debts would be subject to the CDCA. So, I mean, what the Department of Banking is basically saying, and I think it could be harmonized with 6203, is that you look at the inception. Was it a CDCA loan when it was created? And if it wasn't, then it's never subject to the CDCA, whether it's charged off, you know, even if it's charged off. So basically, they're saying a CDCA loan is red, and a CDCA loan is red at birth, and it continues to be a CDCA loan, and that would be determined under 6203 when the loan is created. And then that's when all of the regulations and the oversight by the Department of Banking kicks in. And all of those other provisions that talk about whether you have to get approval for transfers of those loans, et cetera. Whereas a Capital One's debt, you know, a national credit card debt is blue, it's outside of the CDCA, and even if Capital One sells it later, it can't become red. Because you look at the time period when the loan was actually created, and that's what determines it. So I suppose as this plays out, based on what you've just said, if you saw, if PRA sold it, and it got sold and sold, if we embrace your adversary's view, despite the fact that the debt, the charged off debt is three or four removed from PRA, it would still be a loan that would fall, his view, it would still be a loan that would fall within the amount of the loan. Right, right. And so, I mean, if PRA were to have to be subject to licensing, and say PRA does get a license, so then now it can, you know, collect 22.9% interest or whatever for the loan, but then now it's hemmed in. The loan is now hemmed in that if, that now PRA can't freely transfer that loan to somebody else, it has to get the department's approval, and in order to do that, you know, unless that person is also a CDCA licensee. And so you're really limiting the transferability of these loans and their value. As a practical matter, you've negotiated with Capital One and bought this loan at what? Whatever price you bought it at. In the hypothetical that I gave you at the beginning, is it correct, am I thinking about it correctly, that in that hypothetical, PRA could collect from Lutz anywhere up to the $122,900? Correct. Okay. Can I clarify a couple of points? Just back to the definition of negotiate, is it your position that between the two possible definitions that the statute uses it only in the sense of bargaining, not in the sense of transfer of a negotiable instrument? I think that's right. Just again, based on context, that when you look at 6203A and B, you know, it's really talking about what can be charged on the account. And even though it's using the word collect, it's really talking about the negotiation of the loan when it happens. And you can't have referral fees added on and all of these other, like finder's fees by agents or brokers, because they're trying to keep, you know, the amount of money that's being transferred. And there's no guardrails on what can be charged in order to try and do an end run around the 6% interest rate if you don't have a CDCA license. So I think when you look at all of the context of that, that is the use of negotiate that was intended. And is it your representation in the sale of the contract, if you will, to collect on the debt, that there's not an endorsement, a transfer of the loan itself? That's not part of the sale? I don't think it actually is. To Judge Phipps's point, I don't think that anybody's actually physically, like, signing an endorsement. It's more of a transaction of a purchase and sale agreement of these loans or these accounts, these charged off accounts and their balances and the right to enforce. I mean, we aren't in a situation where PRA is trying to step into the shoes of Capital One. This isn't another bank buying one bank's portfolio and saying, we want to buy your credit card portfolio. So we love the terms that you negotiated, we want to step into your shoes and have those exact same terms for us. That would be a different sort of situation. But PRA doesn't want any of those terms. All they want is to collect the accrued debt. Right. I mean, the contract would still be enforceable against LUTs in terms of, like, if PRA were going to, you know, file a collection lawsuit and there are terms in the contract that says what the forum is or if there's an arbitration provision or something like that. Like, PRA does step in the shoes of Capital One from that standpoint, that it's allowed to enforce the contract that LUTs entered into with Capital One. So, but to your point, it's already, it's a charged off debt at this point and certainly PRA isn't trying to charge interest on a going forward basis. That might not be the fact of this case, but you have argued to us that they could, that an entity like PRA could, you know, have a go at it based on your interpretation of the statute, continue charging the 22.9 percent interest. I mean, as part of that hypothetical, it was really if you, if it was still a performing contract, I believe. So, and that goes to the OCC's regulation and Judge Phipps' hypothetical just now about somebody who is trying to actually buy the entire portfolio that's a performing portfolio and continue charging the interest as it's coming due. There's just a difference between buying a loan and buying debt. Like, if you buy a loan, you're buying that agreement, you're buying that contract, you're buying everything that comes with that. And sometimes people sell contracts. That's why we have assignment and delegation doctrines in contract law. It's different to buy a debt. And what you're saying is they bought a debt. The thrust that I got from Judge Krause's question, though, was, well, what assurance are you giving us that all these principles that we're contemplating wouldn't also apply to the buying of a loan portfolio? Because that would seem a little bit more problematic, right? Because then you would accrue, you'd get all the benefits that Capital One negotiated and now you step into their shoes as an unlicensed entity to do that sort of work. And Judge Krause, correct me if I'm wrong, but to the extent there's a distinction here, it almost begins to prove too much that you could buy charge-off debt and buy the entire loan portfolio. I think that goes to the Department of Banking's point, though, that that's not a CDCA loan. So even if Capital One, this is outside of the CDCA, so it's a blue loan. So the CDCA isn't your answer to that anyway of trying to get licensing because PRA was not negotiating the loan. So what you're saying is it's a matter of state law. PRA could not buy the loan. They could buy the debt, the charge-off debt, but they couldn't buy Capital One's loan agreements and their loan portfolio. Is that what you're saying? Well, I mean, it's hard because it's a hypothetical and that's just not its business model or what happens with PRA. But I think that the fact that it's not originated as a CDCA loan, it doesn't fall under the CDCA. To begin with, Capital One can transfer that loan to someone else. And that's kind of what the issue has been with it's valid when made, the arguments in the California case, et cetera, that the OCC is saying that it's valid when made and the terms of the contract continue to apply. If somebody else wants to buy that and step into their shoes, they have the right to enforce that provision. Now, maybe it is a matter of does that person have state licensing? Right? I mean, Pennsylvania, if Pennsylvania wants to impose licensing requirements on an entity that is going to be collecting on debt associated with a loan, you're telling us that we should call this thing debt and not a loan. But non-performing loans are renegotiated to be performing loans also. That's what happens all the time. What happens if we don't need the sale of a portfolio? Let's say we've got this individual loan, at the point that that's sold, now non-performing and perhaps sold as a discount, what prevents, in your interpretation of the statute, the purchaser from turning around without a license and working out a different interest rate payment arrangement with a debtor? I mean, I think the issue with that scenario or question is that it kind of assumes that this is your licensing paradigm and that you would have to have a license in order to do what you just explained, Your Honor. And really... which is that the statute applies and you would have to have licensing if you are making or negotiating loans or advances of money or credit and that you are charging, collecting, collecting interest in excess of what the lender was permitted to charge. So it has to meet both of those requirements to even trigger a need for licensing, and here PRA wasn't collecting interest in excess of what Capital One was permitted to do, it was collecting exactly what Capital One was permitted to charge. And so even under that scenario, if you're following what the... assuming, hypothetically, that a debt buyer did buy a defaulted loan and then does work out some kind of a deal, it would still be bound by the terms of the interest rate contract. And if it was going to charge more than what the lender was permitted to charge, then, yeah, maybe it would need to have some kind of a license. But that's not the scenario, because PRA was never charging more than the lender was permitted. It's your position that that entity could purchase the defaulted loan and negotiating with the original debtor, and return it to performing status, charging up to 22.9% without a CDCA license. Correct, because that was the terms of the original contract that Lutz entered into with Capital One for 22.9% interest, which is, you know, what the Valid When Made, you know, OCC regulation is saying, and that's what the... really what the statute 6203 is saying, too. That you only need a license if you are negotiating a loan and you're charging interest in excess of what the lender was permitted to charge. I mean, that's the language of the statute. So... And maybe it is. It depends on if it's... I mean, if you are going to say that it's negotiating a loan at that point, maybe. But, I mean, I think that you're stepping... yeah, I think you're stepping into the shoes of the lender and this statute, or, I mean, that loan still falls out of the CDCA, because it wasn't a CDCA loan at inception. And so the... from what the Department of Banking says, and I think it, you know, holds up under 6203, is you have... not everything is going to fall within the CDCA. It was really intended to cover, you know, small loans and lenders who were not otherwise permitted to charge more than the 6% interest. And it gave an out, or, you know, an ability to people to be able to actually get loans and free up, you know, loans. Back in 1937, you know, the purpose of the statute was to allow consumers to not have exorbitant loans. It was not to allow charges against it, but still to allow the lenders to want to make the loan, because they can make an appropriate amount of money on it. And so that was the framework of this statute initially, and, you know, you kind of have to look at it with that gloss a little bit. Well, but the licensing regime allows the Secretary of Banking to designate those entities for purposes of not just origination, but also collection and receipt, that it thinks appropriate and legitimate entities to do that. What you're describing as if it doesn't originate as a CDC loan, then all bets are off. And entities can take that over, charging as much as, you know, the original lender would seem to blow a gaping hole. In the licensing scheme, doesn't it? I, you know, I mean, the legislature, that is how they drafted it. They did not, you know, it doesn't say that, you know, this is going to apply to every loan situation. There are lots of other licensing, you know, paradigms that, you know, like the motor vehicle statute, it has, you know, parameters around it. And the CDCA is the same, and you have the entity who's saying that they are, or the entity who's supposed to be the expert, the Department of Banking, who enforces this, saying, we have never looked at the CDCA as though it is, that it applies to somebody who's collecting a charged off account after, you know, after it's been charged off when the account was never under the CDCA to begin with. So the CDCA really is, it does have licensing, and it has guardrails around someone who is a CDCA licensee. They can't transfer those loans to somebody else without giving the department notice. And if they're going to try and sell it, if it is a CDCA licensee, and if it's not a CDCA licensee, the department has to actually give approval. So, you know, there are actual CDCA loans, but the department is saying that you can't pull something into the CDCA that was never a CDCA loan, like the example of the, you know, the dental contract for orthodontia. Well, the banking department is saying that as to a debt, something reduced with some certain, it does not suggest, does it, that that somebody could continue charging interest going forward. No, it does not say that. It does not speak to that. I mean, that was not one of the questions that was posed to it, and it doesn't talk about that. So, I mean, it really, the department did discuss it in terms of the questions that were posed of a charged off national bank credit card debt, correct. So, and that is the scenario here. So, you know, talking about all of these other hypotheticals about whether PRA could continue to charge interest, I mean, that wasn't posed to the Department of Banking, and they didn't give input on it. But, you know, as to this particular loan and the scenario here, it was a charged off national bank credit card debt, and therefore wasn't subject to the CDCA. Thank you so much. Go ahead, sir. Thank you. So I wanted to go back to what is negotiated loan debt. So this is the point that we were trying to make, is that when these loans are sold, all of the contractual rights are sold. So that's why the charged off national bank credit card debt is not subject to the CDCA. So the charge off default distinction does not matter in these cases, because all of the contractual rights are sold. It doesn't matter if an entity is going to choose to not exercise some of those rights. It still is a loan. And on the, for the OCC regulation, one case I did just want to highlight, we included this, I believe, in our, it's either our first or second 28-J response, but it's InRea Community Bank. That was a 2005 case from the OCC, and we included this in our response to this court. And bear with me. In that case, this court said that Sections 85 and 86 of the NBA and Section 521 of the DIDA, another financial institution, federal statute, apply only to national and state charter banks, not to non-bank purchasers. So again, that is contrary to the OCC's regulation and the import of that regulation. And then on the negotiate definition, whether it applies only one way. If it does apply one way, it only applies to the entity that negotiates over a loan to an unlicensed purchaser. That would create an end-run around the statute, because then the purchaser would not be regulated. So again, a bank could originate a loan or some other kind of license lender could originate a loan and then they would not be regulated. They can now do and charge whatever the original creditor could. So because of that, we believe that the term negotiate includes the two parts, two sides of the transaction. But that's assuming the term negotiate means transfer, not bargain. Correct. Correct. Do you think it means transfer or bargain? I'm sorry? Do you think it means transfer or bargain? I think it has both of those meanings. It does, but in terms of this statute. Oh, I apologize. Yes, yes, in terms of this statute. I think it means transfer. Oh, really? Yes. And the reason why, and I know there's the distinction between contract in the remainder of the statute and then loan in this statute, is because the original creditor made pains to ensure that original creditors, CDCA licensees, could not transfer their rights. So let me just push back, because I thought you were going to say it meant bargain. And the reason I thought you were going to say it meant bargain is because when Capital One negotiates the loan with Lutz, there's nothing to transfer, right? There is no loan. So the word negotiate to apply in that circumstance, I think, has to mean bargain, because there's nothing to transfer. So it's really weird if then we say, oh, now once Capital One negotiates the loan, as in bargains for the loan, now the term negotiate changes meaning. And in this kind of fun chameleon version of the word negotiate, it now, once Capital One negotiates and bargains for the loan, it now means transfer. Statutes typically don't work that way. We usually pick a definition for a term in a statutory phrase and say, this one has to work. And that's why statutory construction is hard, because you're usually choosing between definitions that work for a lot of people. But I don't think that you could say that vis-a-vis Capital One, vis-a-vis Lutz, transfer at anything. Sure. So the statute says negotiating or making loans. So to the extent of really what I was trying to key in on is transfer refers to some, whether it's bargaining transfer, negotiate refers to whether it's bargaining transfer, something that someone selling the loan, buying the loan. So what you're saying is that negotiating means transfer and making means bargaining. Making means, yes. Making means originating the loan. Negotiating means buying. And those two terms are used in the statute for a purpose. But for negotiate to mean transfer, the loan would probably have to be a negotiable instrument. Is your position that the loan is a negotiable instrument? To be honest, I have not considered that scenario. Because you typically only negotiate instruments that can be transferred through negotiation. So, sure. And here the thing is that contractual rights, the negotiation is over contractual rights. So PRA is buying the contractual rights of Capital One, all of those rights. I think when negotiate means transfer, it really means transfer in the context of negotiable instruments. I mean, I don't think it means transfer in terms of just general rights and obligations and all this other stuff. That's why the UCC specifies with such exacting precision what instruments can be negotiated, transferred through just an endorsement and a passing on in which can't be. It sounds like we don't have certainty from either council whether there is a transfer of a negotiable instrument in this particular exchange. I take from the sort of tentative answer that we had from Ms. Adkins. And as you said candidly, you don't know. Is that something important for us to have that information to ascertain? The meaning of negotiate the loan in the context of the statute? So essentially we need to know what is negotiated. We want to know what contractual rights, is that, I'm sorry. Well, if it's your position that needs to mean negotiable instrument for negotiate to be effective here, because negotiate, as you're arguing, is a transfer, isn't it your burden to show us that there is a negotiable instrument here and where do we have that in the record? Or even to the extent we could take judicial notice that that's how these things work in representations of council. So I don't believe there is anything in the record whether this is a negotiable instrument or not. But again, what I was trying to focus in on was not whether it's transfer or bargain, is that what it means is one, making the loan is the actual making of the loan, and the negotiating loan is either the buyer or selling of the loan. That's all I was trying to get across. Well, thank you very much, counsel. We appreciate your arguments and we'll take the matter under advisement and we'll take a brief break before our next case.